The next case on the docket this morning is Agenda No. 7, No. 125017, Dennis Tzakis, et al., v. Berger Excavating Contractors, Inc., et al., in Maine Township. On the appellant, please, Mr. Benjamin Matthew Jacoby. Before you begin, though, I do want to remind you that you will be sharing time. Yes, Your Honor. Good morning, counsel. May it please the Court. My name is Ben Jacoby. I represent Maine Township. My colleagues and I are before this Court to ask it to reverse the appellate court's decision and affirm the circuit court's dismissal of this case and our motion to dismiss. We focus this appeal on two main issues. The first, we ask this Court to affirm the circuit court's dismissal of this case on the public duty rule, and also to find and also to reverse the appellate court and affirm the circuit court's finding that this Court's decision in Coleman v. East Joliet Fire Protection District abolishing the public duty rule does not apply retroactively to this case. And I'll be arguing these issues in the first 12 minutes. Second, we ask that this Court affirm the dismissal of the Illinois Constitution takings claim as insufficiently pled under a traditional takings claim analysis. And my colleague from the Metropolitan Water Reclamation District, Anastasios Foucas, will argue that issue. And finally, the plaintiffs here have cross-appealed and request that this Court essentially reverse its decision in Monson v. City of Danville and create a cause of action under the Tort Immunity Act. And my colleague from Park Ridge, Howard Jablecki, will be arguing that issue as well as some other tort immunity issues. So I will move right to the retroactivity issue in this case. This Court weighs three factors in deciding whether to apply Coleman non-retroactively to this case. First, whether Coleman established a new principle of law. Second, whether the purpose of that new law is hindered by the retroactive application of that rule to this case. And third, whether the retroactive application to this case will result in a hardship. I'm going to start with the first and third elements, because in the last 60 years, at least since Molitor v. Caneland Community Unit District in 1959, this Court's analysis of retroactivity has overwhelmingly held that where there's a new principle of law that causes a hardship on a party in a case, it's not applied retroactively to that case. And Molitor is actually a very good example of that. And Molitor is analogous to this case, because in Molitor is the case where this Court abolished sovereign immunity for local public entities. And this Court found that that established a new rule of law, and it caused a hardship to those public entities because they would not have accounted for that exposure in defense. And so that rule of law applied only prospectively. And the same is true here. We have a new rule of law that's been announced by Coleman. The public duty rule as of 2016 is no more, although it had existed for 100 years plus prior to that. And I don't think that point's all that controversial, so I'm going to move to the hardship issue, which also bounces in favor of the nonretroactive application of Coleman to this case. And it's easy to see how. Because the flooding in this case took place in 2008. That's the underlying issue in this case. The lawsuit was filed in 2009. Our clients were added to this lawsuit in 2010. And we filed our first motion to dismiss, asking this Court or, no, we were added in 2009. We filed our first motion to dismiss, asking the Court to dismiss the case on the public duty rule in 2010, a full six years before Coleman was ever even decided that the public duty rule was alive and well at the time. And we counted on the public duty rule in limiting liability and finding that no duty existed for the governmental flood prevention services that we provided. And then from 2010 until 2015, when we were eventually granted our motions to dismiss, as we expected we would be on the public duty rule, the plaintiffs went through three iterations of complaints, eventually landing on the current operative complaint, which is the so-called amended, fifth amended class action complaint, amending the complaint only on its face. That's the name of our current complaint. Complaints before that were dismissed on being legally insufficient. They were 650 pages long. They had footnotes. They were complete with legal conclusions. So finally in 2015, we got our dismissal that we'd been asking for for so long. And then eight months later, of course, Coleman pulls the rug out from underneath us and abolishes the public duty rule altogether. So the hardship here is that the municipal defendants here were unable to claim for that duty, were unable to account for and reserve for the risk. We're all self-insured entities. And now are exposed potentially to a different kind of liability and increased defense costs in an expensive class action case. The First District actually agreed with us that we would experience this hardship, this significant hardship is what the First District called it. But the First District found that the plaintiffs would also face a hardship, because if Coleman is applied nonretroactively to this case, then the plaintiffs' claims are dismissed. And indeed, that's a hardship. But that's not the correct analysis, because the factor is whether the retroactive application of Coleman to the case would cause a hardship. And in this case, Coleman doesn't cause a hardship to the plaintiffs if it's applied to this case. Coleman reinstated claims that didn't exist for them in the first place. The hardship exists in this case to the defendants. Coleman causes a hardship to the defendants, not to the plaintiffs. And so because a new principle of law has been announced, and because it causes a hardship to the defendants in this case, those two factors balance overwhelmingly in favor of nonretroactive application of Coleman to this case over 60 years of Supreme Court precedent. There is a third factor, though, and it's kind of a cherry on top, because it also balances in favor of the defendants in this case. And the last factor is whether the nonretroactive application of Coleman to this case will hinder the overarching purposes of the Coleman new rule of abolition of public duty rule. And the case of Alexson v. Village of Round Lake Park tells us that that factor balances in favor of nonretroactive application of Coleman if the current case, this case, has unique facts and timing so that the nonretroactive application of Coleman to this case will not hinder the application of Coleman going forward. And the first district, our first appellate district, also agreed with us on that point, actually. They found that the unique posture of this case in the complicated pleadings history and the timing distinguish this case from other types of cases, as I discussed before, from 2011 through 2015, the various iterations of the complaint. And so because of that unique procedural posture, the first district found that the nonretroactive application of Coleman to this case wouldn't impact other cases, unlikely. And further, that's bolstered by the statute of limitations that's applied to municipalities, which is one year for claims like this. So a claim filed today would arise from an occurrence a year ago in 2019. And in that world, the public duty rule has long been abolished. Those municipalities are able to account for their exposure and their potential defense costs and rely on other defenses like the Tort Immunity Act and can reserve for those types of exposures. So given that unique posture, this factor of nonretroactive application of Coleman to this case bounces in favor of the defendants here. The first district, though, found ultimately that this factor leaned in favor of the plaintiffs. And they did that in looking to the purposes articulated for the Coleman decision and the Lee decision, which was authored by Justice Kilbride and joined by Chief Justice Burke. And in particular, that first purpose of the rule, which was stated as being that the public duty rule over time has been muddled and caused inconsistent results. And the first district in particular looked to a second district case that had come out, Salve v. The Village of Lake Zurich, which had found that the public duty rule was another flooding case. And that court had found that the public duty rule did not apply to that case because it had been abolished. And that case came out later, 2016. But the first district erred in that analysis, too, because there was no analysis of retroactivity in the Salve case. In fact, the lawyers in that case briefed and argued the case prior to Coleman ever coming out. And then after Coleman was decision, the appellate – after Coleman's decision was handed down, then the appellate court issued its opinion. And the appellate court just accepted the fact that Coleman abolished the public duty rule and didn't apply any retroactivity analysis. It's unclear whether anybody ever raised it in the first place. It doesn't appear that way from the opinion. So a nonretroactive application of Coleman to this case, where a retroactivity analysis is conducted, is not inconsistent with the Salve case, where no retroactivity analysis was conducted at all. The plaintiffs argue in their brief – I'll address this briefly. For the first time, I should mention that the nonretroactive application of Coleman to this case is inconsistent with the duties that are codified in 3102 and 3103 of the Tort Immunity Act that arise from property ownership. And that's not correct either. In fact, the public duty rule has existed in unity with those duties for over 100 years. And the duties that are alleged in this case are not the types of duties that are generally codified in 3102 and 3103. The duties alleged in this case are for governmental services to prevent flooding, like pumping down stormwater from infrastructure that you don't own, failing to mobilize tanker trucks to pump water into, failing to sandbag at the rate of 10,000 sandbags per hour, and failing to mobilize people to disperse those sandbags, failing to put up flood protection barriers, failing to redesign the creek, and this is a creek, altogether. And those are governmental services that they've alleged in their complaint that breach the duty. But those aren't the typical pothole or defective sidewalk or slip and fall that you find codified under 3102 and 3103 for the failure to maintain reasonably safe property. And further, 3102 and 3103 require a public property, and that's defined by 3101 as a property that's owned or leased. It does not include it. It actually specifically exempts easements. And ownership in this case is not pled. The reason why is because the main drain, quote, main drain that runs through this neighborhood is actually Prairie Creek. We know that from the IDNR report, 2009 IDNR report that's attached to their complaint. Claims allege that that Prairie Creek existed in 1960 and was developed by a private developer, none of us. That's paragraph 62. And further, that the ownership arising from that creek is no longer, is not appliable to our clients. And I see that I'm out of time. So if anybody has any questions, unless the Court has questions, I'll defer to my colleague at the district. Thank you. Mr. Foucas, are you there? Good morning, and may it please the Court, my name is Anastasios Foucas, and I'm an attorney at the Metropolitan Water Reclamation District of Greater Chicago. And on behalf of our general counsel, Susan Miraculous, I'm honored to be here before you today. The public duty rule and the Tort Immunity Act also bars plaintiff's taking claims, but I want to focus on the underlying taking claim itself, which fails and was not properly pled for two independent reasons. First, a claim for a taking by inaction has never been recognized in either the federal or Illinois takings clauses. And second, a taking does not occur when a private entity causes the intrusion on Four years ago, another attorney from the Metropolitan Water Reclamation District stood before you in Hampton v. the MWRD and argued that the distinctions between the Illinois takings clause and the federal takings clause should compel this Court to disregard federal precedent and not follow the limited lockstep approach. This Court rejected that argument. Today, we stand before you today asking you just to follow Hampton and adhere to the inaction is insufficient to state a taking claim. Starting as far back as in 1939 in the United States v. Sponenberger case, the U.S. Supreme Court found that failure to protect a property from flooding is insufficient to state a taking claim. Continuing all the way through the Federal Circuit's decision in St. Bernard Parish government v. the United States, where the Federal Circuit found that, once again, a failure to maintain or a failure to modify is insufficient to state a claim for a taking under the U.S. Constitution. The Court there noted that a failure to modify or maintain may give rise to a tort claim, but it cannot give rise to a taking claim. This Court's decision in Hampton relied on Arkansas Fish and Game Commission v. the United States, where the U.S. Supreme Court found that for a temporary flooding to state a taking claim, the flooding must be the foreseeable or intended result of government action, authorized government action. This Court used that language. All we are asking for is that to be applied to this case here, because as Mr. Jacoby mentioned, what plaintiffs are actually pleading is a failure to act. No Illinois case has ever held that a failure to act is sufficient to state a claim for a taking. No Federal case has ever said that failure to act is sufficient to state a claim for a taking. And the reason behind that is because the takings clause is not designed to cure all harm that may come from government action or from government activity. Rather, it's designed to address a specific situation where government comes in, takes your property, and does something with it. Right? Whether it's build a courthouse, build a road, or build a sewer, they have to pay for the right to do that. It is not designed to take or set a standard of care for government. That's not the purpose of the takings clause. But is issuing a permit by a government agency a government action that would fall under your definition of government action? It has never been held that by any court within Illinois, and it has never been held that by any Federal court. In fact, in Mazes v. the City of Chicago, which is a case that the plaintiff cited, that is, again, another district case. The district was building an intercepting sewer in the City of Chicago. We still own that intercepting sewer. The district was responsible for a taking. The City of Chicago wasn't, because all the City of Chicago did was grant an easement and approve the plans that the district issued. The first issue, the appellate court said that's insufficient to state a claim for a taking. In this court, while not in a takings context, but in Ferenczek v. the Village of Frankfurt, found that making sure that a building permit adheres to certain regulations is passive public protection. It is not active individual assistance, so therefore, liability could not have been conditioned on that. Again, that would be a massive expansion of what takings the taking clause does, is if simply issuing a permit, then effectively every time any building, any house, anything was built, that would be government action that could justify a taking. What effectively would happen, and one of the problems with doing so, is it would convert government into insurers of all property within their jurisdiction. It would also potentially muddy and confuse the waters of what is relatively a straightforward claim. Takings, if the government comes in and takes your property, they're responsible for it. But in a situation where it's a failure to act, as has been alleged here by the plaintiffs, there are five different units of government that they allege failed to act to protect them from flooding. Four different layers of government, two municipalities, a township, a county, a special district. They could have also asserted a claim against the State of Illinois. At the end of a condemnation proceeding, we're buying something with our money. We're buying a property interest. In this situation where it's a failure to act, what property interest does each of those five entities get at the end? Who is responsible for maintaining that property that they're purchasing? These are questions that would necessarily be raised if the Court extended takings liability to inaction. And they would not exist if this Court held with the uniform body of case law that at the Federal level, in this Court's own language, that affirmative government action is necessary. And that leads, then, to the second point, is that a taking does not occur when a private entity causes the intrusion. In this situation, the plaintiffs have alleged that the water that invaded their homes, and it's in paragraph 620.2 of the amended Fifth Amendment complaint, amending the complaint only on its face, states that all stormwater which invaded the plaintiff's home originated from advocate property with the exception of insignificant tributary stormwater to the Robin D. Main drain. They don't assert that advocate's property contributed a portion. They say that all of the stormwater that came to their home was from advocate's property. This and the third district in Sorrells v. The City of Macomb stated, traditionally, takings claims arise from government action alone, not from multiple causes that would include actions of private actors. That is what is being asserted here. If there are multiple actors, that type of a claim belongs in a tort claim, if one can exist. If plaintiff's claims exist here against anybody, they exist against advocate, not the municipalities, not anybody that may have issued a permit. Again, no case has ever held in Illinois that public entities are responsible for paying takings damages for an intrusion caused by a private entity. Unless this Court has any other questions, for those reasons, we would ask that this Court reverse the first district's decision reversing the trial court and affirm the trial court's dismissal of the takings claims with prejudice. Thank you, Mr. Chief Justice. Thank you. Mr. Jabloki. May it please the Court. Good morning, Your Honors. Again, as Mr. Jacobi mentioned, my name is Howard Jabloki. I represent the City of Park Ridge in this matter. I'm going to be addressing the Tort Immunity Act's role in both the affirmative appeal on behalf of the public entities as well as in response to the cross-relief that's been requested by the plaintiffs. Now, before getting into the request for cross-relief, I'm going to talk specifically and briefly about the application of the Tort Immunity Act to the claims themselves. And in order to do that, it's important to look at the purpose of the Tort Immunity Act itself. And that's stated expressly in the statute, to protect local public entities and public employees from liability arising from the operation of government. It's expressly stated in the statute, and it's even further expressly stated that the Act grants only immunities and defenses, does not create causes of action. Now, looking specifically at what is applicable to Section 1204 defines the applicability of the Tort Immunity Act to any damages to or loss of property alleged in a civil action, whether that's based on the Constitution of the State of Illinois or on common law. And that inclusion of constitutional claims was intentionally added to the Tort Immunity Act to cover or to address cases that have been decided in the past. So when we're looking at all the claims that are present in this case before the Court, the Tort Immunity Act does have general applicability to all the claims that have been raised. And specifically, and most importantly, is the Section 2201 discretionary immunity that's provided to local public entities. And the appellate court did address this in looking at the specific basis for dismissal. And they did state that Section 2201 was likely applicable to the claims in this case. They just indicated based on prior precedent that some more evidence needed to be presented for it to be dismissed instead of at the pleading stage. But what the appellate court did not look at was the actual allegations that are pled in the complaint themselves. And the plaintiff expressly pled that there was exercise of discretion by the public entities in this case. They talked numerous times about conscious disregard for flooding concerns. They talked about reports and studies that were looked at and evaluated and the conscious the alleged conscious disregard by the local public entities. That alone shows that there was a discretionary act and warrants the application of 2201 should the claims be allowed to survive the retroactivity of the public duty rule. In addition, the other immunities that have been touched on a little bit before, and they're outlined in our briefs, but we talked a lot about permits. And the Tort Immunity Act does provide for immunity for the issuance of permits. And at the heart of it, that's what the plaintiffs are claiming and the majority of their claims is that the public entities issued permits for construction to proceed by other entities, and that's something that the Tort Immunity Act expressly immunizes public entities from. There's also immunities related to negligent property inspections in Section 2105. Again, the appellate court looked at these specific immunities, but rejected those saying that they don't apply to local public entities' own property. But again, in this case, that's not what we're dealing with. There's no allegations that there's property owned by the local public entities, and there's nothing to support that. And the appellate court essentially acknowledged that there was no ownership when they dismissed the adjacent property owner claim. And that leads into the request for cross-relief that the plaintiffs have made in their briefs before this Court. The first one is that they should have, they're asking this Court to reverse the dismissal of their adjacent property owner claim. But as the appellate court correctly found, there can be no adjacent landowner duty owed to the plaintiffs if there's no ownership interest by the local public entities. And the plaintiffs themselves can point to no cases that depart from that standard that was set forth in the Van Meter case that you need, you can only have that duty owed to landowners. They rely exclusively on the restatement third of torts, which hasn't been adopted by this Court or applied to this Court in any such adjacent landowner cases. And there's certainly no reason to do it in this case, especially when the appellate court correctly found that there is no, there's no ownership interest by the public entities in any adjacent land. At most, the appellate court found that there was easements that don't qualify as property ownership, and that at most they own the sewers and the drains, but not the land underneath them. So for those reasons alone, that adjacent property owner claim should be dismissed, which was correctly done by the appellate court. Now, the more important crux of the cross-relief that's claimed gets into the Tort Immunity Act itself and whether the Tort Immunity Act can set forth independent statutory causes of action for property maintenance. And according to the plaintiff, they're asking this Court to depart from longstanding precedent that the Tort Immunity Act does not provide independent causes of action. And that's supported, again, by the purpose of the act itself, which is to provide immunities and defenses. That's the express purpose of the Tort Immunity Act itself. And it aligns with what this Court found in the Monson case just a couple years ago that expressly said the same thing. The Tort Immunity Act does not create independent statutory causes of action. And there's no reason to depart from that precedent in this case. And it's for multiple reasons. First off, if you look at Section 3102a, which plaintiff claims states an independent cause of action, ignoring the fact that this Court has held that the 3102a only codifies a common law duty and contains no independent cause of action. And per this Court's ruling in Monson, there is no limitation on that. There's no limitation from other sections of the Tort Immunity Act because the Tort Immunity Act says Section 3102a just relates to a codified duty. But more importantly of the Court's ruling in Monson states that the 3102a only  And per this Court's ruling in Monson, there is no limitation from other sections   But more importantly of the Court's ruling in Monson states that the Tort Immunity Act states that the Tort Immunity Act acknowledges that there is a common law duty that municipalities have, right? So how do we reconcile that? Are these allegations the kinds of things that are barred by the Public Duty Act rule,    or the specific, for example, premises liability ideas with common law duties? Is there a duty or not? It depends on what's alleged, Your Honor. And in this case, they're alleging a violation of providing of government services as a whole. And that's where the public duty rule comes into play. We're not talking about a 3102A claim for a specific maintenance of property. It's important, and as my colleagues mentioned, we're not talking about maintenance of property. Their claim is that we didn't improve the property, that we didn't make changes to the property. So it's not a 3102A argument, and it's an important difference and reconciles how those two can connect together, because the public duty rule, as it was in effect prior to Coleman, talked about providing government services to the public as a whole, not maintaining a sidewalk. I don't think you would be arguing this if this was a trip and fall on a sidewalk. And that's the expressed difference here, that they are looking for maintenance as a whole. And again, the same analysis goes with the 3103, where they're claiming an inadequate or unsafe design. Now, ignoring the fact that the timing of a design claim was far outside, we're talking about designs of the 1960s, you know, there's a 10-year statute of repose on any design claims, and the appellate court didn't look at that argument, but it was included in our briefs, and it was asserted numerous times throughout the motions to dismiss. But looking at the design claim itself under 3103, again, that doesn't the plaintiff's argument as to why that should state an independent cause of action also doesn't fit, because their reading of the second sentence of 103A would essentially seek to impose strict liability against the municipality if there's an unsafe design. And they claim that that second sentence removes any immunity. But that argument, that logic doesn't fit with the purpose of the Tort Immunity Act itself, and it doesn't even fit with other provisions of the Tort Immunity Act. You have other provisions, such as section 2202 about law enforcement, that gives immunity for execution and enforcement of law, but removes it for willful and wanton conduct. That doesn't mean that a separate cause of action is stated under section 2202. It's simply a limitation on the immunities that would otherwise apply to a municipality. Thank you, Your Honors. Thank you. Mr. Okel. Mr. Okel. May it please the Court and counsel for the appellants, I begin by pointing out what we submit as the most important operative controlling fact in this case, and that is that plaintiff's damages arose, occurred, and they continue to occur as a result of inherently an artificial and inherently dangerous condition on property that's either owned, possessed, or in some manner controlled by the defendants. That condition is a public stormwater sewer system. It's not a river. It's not the Mississippi. It's not a waterway. It's a public stormwater sewer system. And the LPEs, the defendants, in one fashion or another, were involved in the eruption of that system and are currently involved in the operation of that system, and they expect the plaintiffs to use that system. The mechanism of damages is important. It's important for a number of reasons, and the very fact that this is a public improvement impacts everything from the Tory Immunity Act to the application of the public duty rule. And I would ask the Court's attention. It appears at page 3 of our brief, and it's attached as page 218 of our separate appendix, and I have an exact same size copy. It is a diagram of the Prairie Creek stormwater sewer system. And I want to point out how it works briefly because it's important for a number of factors. This is a public stormwater system, okay? It's not a private system, and the system is designed to collect water from Park Ridge. That's why Park Ridge is a defendant in this case, for other reasons. It collects the water from Park Ridge and deposits that water into two basins, the Ballard Basin and the Pavilion Basin. It's on advocate property. We acknowledge that that property is private, but the basins are created for the purposes of handling a public stormwater system. And, in fact, Park Ridge was intimately involved in that particular process, And part of our appendix includes 146 is attached and appears at page 25 of our brief, and that is the permit that was submitted to the Metropolitan Water Reclamation District. Why? Because Park Ridge is going to be sending their water, their upstream water, into these basins as part of their sewer system. And they signed off on that permit stating that the owner of the local sewer system is a city of Park Ridge. Now, when that water gets into the two basins, and the Ballard Basin and the Pavilion Basin are probably the biggest issues here, once that water gets into that basin, those two basins, it's discharged through a pipe, a sewer pipe, and it goes into what's known as what we call the main drain. It's a 10-foot channelized drain, kind of like a miniature canal, 10 feet wide. It collects that water. Now, it's important to note, as in that diagram, which appears at page 218 of our appendix, it shows two pipes going in there, one C1 and C2. Those are both 5-foot pipes. So there's two 5-foot pipes taking water into a 10-foot open channel. That makes sense. Now, that 10-foot open channel runs now through Main Township. Now, Main is involved in this case because Main Township uses that system at that particular point. Why and how? Because there are tributary street sewers, drains, that drain and have to drain someplace. They drain into that 10-foot channel, which is all fine and good except located at point E on this diagram at page 218 of our appendix is a bottleneck. And that bottleneck is located in Main Township. And as a result of that bottleneck, it's not, I guess, rocket science. As a result of that bottleneck, that particular pipe there, it's an underground culvert. It's not even open. It's underground and it's only 5 feet in diameter. So now Park Ridge and the district that manages everything and now Main Township are now all expecting that 10 feet of water is going to fit inside a 5-foot pipe. Not to be facetious, but it almost sounds like a movie I saw recently, My Cousin Dinny. Is it some kind of magical pipe? It isn't. And that's the problem. As a result of that particular condition, the water surcharges and backs up. The water actually reverses its flow to our clients' homes who rely upon their street sewers draining into the channel. Can't do it anymore. What's worse is the water keeps surcharging and because the Ballard Basin and Pavilion Basin can't empty out, the water starts rising. And it gets to the point that it literally cascades over the walls of the basins, turning into a tsunami, inundating our clients' homes. Now, an important factor here, because it also figures into the Takings Clause in terms of action, affirmative action by a government, the fact of the matter is, is that they acknowledged there was a 1990 HARSA report. In that report, it appears at page 168 of our appendix, the HARSA report states that the main drain, which is ten feet and a five-foot pipe together, are unable to convey a five-year storm capacity. People today talk about hundred-year storm capacities. They can't even convey five years. And at appendix page 155, we note the HARSA report states, flood protection against the 100-year statistical recurrent event is the minimum accepted level. This is HARSA talking to them in 1990. Now, that problem hasn't been changed. And I, but the important point here in terms of bringing up this history, the important point about the fact that this is a public SOAR, it impacts the public duty rule because of the fact we submit, and it's in our briefs and we've argued it repeatedly, is that the public duty rule, I know we hear about Coleman and retroactive application, but the public duty rule has never been applied in the context of damages arising out of a public improvement. And there can be no issue in this case, no issue in this case regarding the type of damages that occurred here. Kagan. May I ask you just one real fundamental question? Yes. What are your causes of action? All right. Okay. One, negligence. Dominant estate overburdening stormwater. Are you still relying on that theory? Yes. Okay. No, it's the adjacent ownership claim. Pardon? Adjacent ownership. So are you abandoning, I mean, your complaint, in the Fifth Amendment complaint, I think there are six theories, six counts that were theories, maybe, to look at. Right? I just want to make sure that we're talking about the same thing. All right? Sure. Correct. Number one, negligence, colon, dominant estate overburdening stormwater. Is that your count, your cause of action? Those, I believe, claims were withdrawn. No. We're proceeding on counts 25, 45, and 64 of the complaint, which assert adjacent property owner claims on the grounds that adjacent to our client's home. Okay. So number two was negligent nuisance. Are you abandoning that count? Negligent nuisance still stands. Okay. Three, negligent trespass. Yes. Statutory duty to maintain. Yes. Duty to remedy a dangerous plan. Yes. And taking a personal property. Yes. But you're not, this first one, you abandoned the first one. That is correct. Okay. Now, going back to the, aside from the fact that the public duty rule has never been applied to a, in the context of damages arising out of a public improvement, okay, the actions of the LPs in this particular case also support a takings claim. Now, it was brought up during their opening argument, the question about whether or not issuance of a permit would be sufficient, perhaps, to bring in government action. Well, if you're talking about a permit requested by a private person to build a private thing that only private people use, maybe so. That's not this case. This case involves a permit submitted to a governmental body, the Reclamation District. It was signed off by Park Ridge, and it involved building basins, albeit on private property, but basins that had the clear and intended use of collecting water upstream from Park Ridge. So is this, I'm being real technical. Sure. Because it seems to me, to be able to figure out some of these things, we have to know what the causes of action are. Okay. Is this number five you're talking about? Duty to remedy a dangerous plan? Yes. Premised on allegations that Section 3-103 of the Tort Immunity Act sets forth a duty for a public entity to correct unknown, unsafe conditions? Yes. In design. Is that a duty you're talking about? Yes. Okay. Yes. Now, the – in terms of talking about the affirmative action, I know they cited to Hampton. Hampton recognized that temporary flooding is sufficient to create a taking under the Constitution. The only reason the plaintiff failed in Hampton was because they couldn't establish that the district knew or should have known that flooding would occur. They can't make that allegation here. They clearly knew that flooding would occur, could occur. And while it's – in Hampton, what happened was that the district, I think, took a pump and they pumped – in some instances, they closed locks, but as far as the plaintiffs were concerned, I think they took a pump and they pumped water from one stream to another, or what have you. I think the Addison Creek was involved. Well, they can't say that, in this case, the district took a pump and pumped the water out of the main 10-foot main drain into our clients' homes. No. But they might as well have done that because they created an impossible situation of trying to send 10 feet of water into a 5-foot drain. And the end result of that was to turn our clients' homes into the basin they didn't want to build. A basin, by the way, which we allege in the complaint and established by the IDNR, a basin that could have been built in a soccer field and, according to the IDNR, would have reduced the risk of flooding by 84 percent. But they didn't want to do that. Instead, they just let the water go and they might as well have just pumped it into our clients' homes because it literally had no place else to go. Counsel, I want to make sure I understand you. You're saying we don't really need to reach whether Coleman is retroactive because the public duty rule wouldn't apply? I'm not withdrawing the argument we made. I think that the Coleman abolition, the public duty rule, clearly applies to this case. I think that the rationale in Molitor about why it should apply to the plaintiff in Molitor is applicable. And as long as Your Honor brings that up, in their reply, they bring up the case of List, L-I-S-T. And the problem with citations of that case is, in this particular case in Molitor, the cause of action arose, I want to say it's like March 2008, or it was my no, excuse me, March 1958. The cause of action in List arose in January 1957. So in Molitor, when the court decided to abolish that immunity, it relates back to the date of the cause of action. And I would submit, should any cases forward or cause of actions forwarded from that point, with the plaintiff in List, that wrongful death action arose in January of 1957, more than a year beforehand. And therefore, the fact that the Molitor decision changed law for that cause of action forward wouldn't have had any effect in any event. In this case, okay, in this particular case, the difference in time is, our cause of action arose in September of 2008. The cause of action in Coleman arose in June of 2008. They filed their lawsuit in April of 2008. We filed our lawsuit in, I forget now, shortly thereafter. And at the same time, what's also important is that during the entire period of time, certainly they wanted to argue the public duty rule, but we were also opposing it. And I appreciate their professionalism in bringing up the public duty rule in this case, but when else was it ever brought up? It wasn't. Okay? And therefore, I submit in terms of the Chevron standards, they cannot really argue that they relied upon the public duty rule, because I can't find anywhere where they did. And what's also important, on the other side of the coin, when you talk about the equity side, we relied on the fact that the public duty rule has never been applied in a case involving damages in the context of a public improvement. What about us? And not only that, not only did we rely upon the fact that that rule did not apply, we also are the ones who suffered catastrophic damages. Now, this is a 2009 case, or 2008 case. Since this case has been going on, this case has consolidated. There's four other, a total of four cases involving repeated incidents here. So we're talking about plaintiffs who have repeatedly lost everything because their home has been turned into the retention basins that the district didn't want to build, or Main Township didn't want to build, or Park Ridge didn't care about because they're upstream, and as long as we get the water away from us, we're fine with that. That's simply inequitable. I'd like to go to, because I do have to address our cross-brief, with respect to the adjacent owner claims. The reason the – there can be no dispute that the property adjacent to our client's homes has an inherent, very dangerous risk. I mean, it's a system built upon a five-year storm cycle. That's just plain ridiculous. Now, so the risk exists there. The problem that the appellate court had was the fact that we did not allege that the property and where that risk was located was actually owned by the defendants. And they criticized us for talking about the restatement, but the fact of the matter is, in the Deavers case, in the Debert or Dibert case, which involved a restatement of torts, in those particular cases, while dealers did talk about the restatement, in that particular case, I think the defendant owned the property, but the court, if you look at the opinion, repeatedly talks about possessor of land, possessor of land, possessor of land. Likewise, in the Dibert case, that was a general contractor. He didn't own the land. He just created a condition on the land, and somebody got hurt. That's why 343, 342A were applied. They were accepted by this court. Again, there's a difference between property law, as we point out in our brief, and tort law. Under tort law, ownership is not the predicate for liability, and that's why we think that it's a natural extension, if you will, or follow-through for the court to adopt Restatement 49, which pertains to possessor of land in causing injury to somebody outside the land, and likewise, Restatement 54 is entitled duty of a land possessor to those not on possession of the land. There's not much of an extension there when you say, okay, a contractor is going to be responsible to somebody getting hurt on land they don't own, and only because they created the condition, there's not much of an extension of the law. We have a situation here where the LPEs, the district or what have you, they have easements. Those easements are established. They appear at page 13 of our brief. It's attached as page 186 of our appendix. The easements are there. So they have easements. They have the control of that particular property. It is a danger, inherently dangerous condition, and it's causing injury to our clients. With respect to the TORC claims, I understand the point. Kagan. There are lots of ideas here, but this argument that you're making now, this adjacent property owner argument. Yes. It's not in your complaint. The action that we had before that pertained to negligence, we withdrew that, and to make the claim of adjacent ownership. Because the biggest of the two things you're saying that you're making is a completely new argument. The adjacent ownership claim was allowed by the appellate court. I didn't argue that particular case or handle the motion. Was there a motion to amend the complaint? Yes. There was a specific motion presented before the appellate court, first district appellate court, to argue adjacent ownership claim, and that's what Justice Gordon ruled upon. He ruled that, yes, the facts may otherwise ordinarily establish that claim, except for the fact that the artificially dangerous condition is not situated on land that's owned by the defendants. Our position is, is that since this is a tort case, and I believe Justice Gordon cited to a property law case, that the two are different. With respect to our statutory claims, okay, I am fully aware of the plethora of cases that talk about the Tort Immunity Act, et cetera, but the fact of the matter is, I don't know how you reconcile 310TA that does not grant any immunity, but merely codifies common law duty. So what is that exactly? Okay. Secondly, with respect to 3103A, that's really, in one sense, the heart of our case. That's sentence one and sentence two. It's interesting because sentence one of that statute specifically talks about liability under Article III. It says a local public entity is not liable, not liable under this article. Why are they even talking about not liable under this article unless there's something in the article that's creating a duty that would give rise to the liability? And under that sentence, too, is very important. The local public entity is liable, however, if, after the execution of such a plan or design, it appears from its use has created a condition that is not reasonably safe. It's true. They've known about that since 1990. Thank you very much. On the basis of the arguments presented, we ask the Court to reverse the appellate court with respect to the dismissal of our accounts and also sustain the appellate court with respect to its rulings in our favor. Thank you. Thank you, Mr. O'Connell. So, Mr. Foucault, you've got the short straw? Apparently. I fought for it. So just a few points briefly. I think the dialogue that this Court had with the plaintiff's attorney highlights some of the issues that we've faced throughout this litigation in terms of what is being alleged, what claims are, and, in particular, what claims still exist. I think we have now made – it's been made clear that they've abandoned the dominant state overburdening claim, which is alleged in their complaint, and they claim that the appellate court granted them leave to amend their complaint. That never occurred. They were allowed to argue it, but the complaint still stands. The operative complaint is the amended, fifth amended complaint, amending the complaint only on its face, which does not contain that claim. More to the point about both that and their statutory duty claims, the issue there is whether or not there is ownership of some property by the public entities. Plaintiffs haven't alleged that. Plaintiffs don't allege that. Now they claim that we are a possessor of adjacent property. Well, the Tort Immunity Act defines what public property is as property either owned or leased by a public entity. It is not possessing. It is owned or leased. That's from the – from 3-101 of the Tort Immunity Act of what public property is. So for those claims that are premised on the alleged statutory duties that are statutory causes of action, again, which they've abandoned any common law negligence claims for failure to maintain or operation of a plan, that is not public property under even – what they've alleged here is not public property under the Tort Immunity Act, because they don't allege that we own or lease any portion of an adjacent property or any part of it. And with respect to Prairie Creek, and it is Prairie Creek. That is what the HARSA report calls it. That's what the IDNR report calls it. It is a study of flooding along Prairie Creek. They may claim that it has somehow been converted into a public improvement. But what they don't allege and they don't tell this Court is who did what along that stormwater system? Who created that bottleneck? That's not alleged. In fact, what they allege in this case is that that was developed by a private entity. And so now what the expansion of liability that we're talking about here is massive because it's, again, a development that was built by a private entity, potentially authorized at some point by Cook County, that is now being foisted upon Maine Township, Park Ridge, and the district. When we never built it, we didn't control it. But because water flows downhill towards the creek, that somehow that is now ours. Or that the district, and this is very personal to me, that the district controls everything. We are responsible for nearly 90% of the land area in Cook County. If we are responsible for all stormwater systems within the entire county, which is never privately constructed, publicly constructed, owned by other entities, we would cease to exist as an agency because we simply could not meet that standard. And that is not what the General Assembly did in granting us stormwater management authority. They didn't convert us into the property owner of all stormwater systems. That simply doesn't exist. It's been invented by the plaintiffs. And it would be an extreme detriment to the district if all of a sudden we now are responsible for ensuring that all stormwater systems protect everybody from where they start all the way to the end. And that's not to say that that isn't our goal. We have hundreds of engineers who are working today, as I speak, to try and fix and help flooding across the county. Maine Township and the City of Park Ridge work to help their residents. We're not saying that we don't have an interest in helping people. That's what we do. That's why we're public servants. That's why we are here. But the question is, are we liable if we don't do it perfectly? Are we liable if we don't intrude on advocates' property and maintain it or enlarge something? That cannot be the situation here. And that would be a massive expansion, not just for the three entities here, but for every municipality. If the standard is now anywhere within your jurisdiction, if you're aware of flooding, that you have a responsibility of fixing it to the detriment of being liable either for a taking or for negligence at any point, that can't be. This is not a situation where we built something and it is failing. This is not a 3-1-0-2 situation where, like, they cite the City of Chicago versus Seidman or Seidman versus the City of Chicago. That was a situation where somebody stepped into a hole on public property and twisted their ankle or broke their leg. I'm sorry. That is clearly a situation that would be covered by a duty that we owe. We don't owe a duty to fix problems on other people's property with the prospect of liability on the other end. And specific to Park Ridge and the district's permitting system, that permit that was held up and is attached is a sanitary sewerage system permit. It's to make sure that wastewater flows from advocates' property into the system so that it eventually gets treated by our plants. It is not about a stormwater system, because when that permit was issued, we didn't have stormwater authority. It's not there. Park Ridge does own the lateral sewers that connect its residents to our interceptors to eventually be waste to allow wastewater to be treated. But they don't own every ditch on their, within their municipality. That's never been held, and there's no evidence, there's no allegations that that should be the case. And I just want to reiterate, unless the Court has any additional questions for us, the potential liability that would be foisted on local public entities throughout this State if plaintiff's claims are allowed to proceed based on the fact of a failure to maintain other property developed, built, maintained by private entities, it would be ruinous to local government and the services we could provide. And we ask this Court to affirm the trial court's dismissal of these claims with prejudice, unless the Court has anything else. Thank you very much. Thank you, Mr. Fuchs. Case number 125017, Dennis Takas v. Berger Excavating Contractors, will be taken under advisement as agenda number seven. Thank you all, Mr. Jacoby, Mr. Fuchs, and Mr. Jablacki, and Mr. Opal for your arguments.